## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **BEST PROCESS SOLUTIONS, INC.,** | **Case No. 1:21-cv-00662** |
| **Plaintiff,** | |
| -vs- | **JUDGE PAMELA A. BARKER** |
| **BLUE PHOENIX INASHCO USA, INC.,** | |
| **Defendant.** | **MEMORANDUM OPINION & ORDER** |

Before the Court is Defendant Blue Phoenix Inashco USA, Inc.'s ("Inashco") Motion for Summary Judgment filed on September 1, 2023.  (Doc. Nos. 92, 93.)  On October 2, 2023, Plaintiff Best Process Solutions, Inc. ("BPS") filed an Opposition.  (Doc. Nos. 109, 110.)  On October 16, 2023, Inashco filed a Reply.  (Doc. Nos. 113, 114.)

For the following reasons, the Court GRANTS IN PART and DENIES IN PART Inashco's Motion for Summary Judgment.

## I.  Background

### A.  Factual Background

BPS manufactures bulk processing and recycling equipment systems.  (Doc. No. 1, ¶ 7.)  One of its recycling systems is the RecoverMax fines process.  (*Id*. at ¶ 8.)  BPS developed this system in 2016.  (Doc. No. 104, PageID# 3423.)  It allows for the recovery of non-ferrous metals (such as aluminum and copper) from incinerator bottom ash.  (*Id*.)  Timothy Conway ("Conway") is the CEO of BPS.  (*Id*.)

Inashco processes incinerator bottom ash to recover metals for recycling.  (Doc. No. 105, PageID# 3576.)  It ships its processed incinerator ash to a facility in Maastricht, Netherlands, and

separates the non-ferrous metals into different categories. (Doc. No. 107, PageID# 4271.) Inashco is the United States subsidiary of a Dutch company. (Doc. No. 105, PageID# 3575.)

In July 2016, BPS emailed Inashco to see if it would be interested in BPS's RecoverMax system. (Doc. No. 93-12, PageID# 2810.) Inashco expressed interest in the RecoverMax system to reduce the cost of transporting its processed incinerator ash from its facilities in the United States to its facility in Europe. (Doc. No. 105, PageID# 3583.) After some initial testing, on August 3, 2016, the parties entered into a Mutual Non-Disclosure Agreement ("NDA"). (Doc. No. 1-1.) The NDA defines confidential information, in part, as "proprietary information concerning the components, construction and processes of BPS's RecoverMax technology used for crushing the mineral components of a non-ferrous metal concentrate as derived from municipal solid waste ash by means of [Inashco's] process." (*Id*. at PageID# 14.) Confidential information also includes, in part, "all information, whether or not it is labeled as confidential, and whether it is disclosed before, on or after the date of this Agreement, that shall be disclosed to the Recipient in connection with the Potential Transaction." (*Id*.)

The parties agreed to "use the Confidential Information only for the purposes agreed to between the Parties and for the purpose of determining whether the Parties wish to enter into the Potential Transaction." (*Id*. at PageID# 15.) And they agreed to "maintain the Confidential Information in strict and absolute confidence at all times, and [to] not directly or indirectly disclose, expose or make available any part of the Confidential Information to any person or entity." (*Id*.) The NDA provides several exceptions to these obligations, as follows:

**4. Exceptions**. This Agreement imposes no obligation upon a Recipient with respect to any Confidential Information to the extent that the Confidential Information: (a) was possessed by the Recipient prior to its receipt from the Disclosing Party; (b) is or becomes a matter of public knowledge through no fault of the Recipient; (c) is

2

rightfully received by the Recipient from a third party not owing a duty of confidentiality to the Disclosing Party; **(d) is disclosed to the Recipient by, or with the authorization of, the Disclosing Party**; (e) is independently developed by the Recipient without any use of the Disclosing Party's Confidential Information; or (f) is required to be disclosed by the Recipient pursuant to an order of a court of competent jurisdiction, by applicable law or regulation, or by valid subpoena or similar process, provided that the Recipient shall provide the Disclosing Party with adequate prior written notice of such legal requirement, and to the extent possible, with the opportunity to oppose the disclosure or obtain a protective order.

(*Id*. at PageID# 15-16 (second emphasis added).)

On January 4, 2017, the parties entered into a RecoverMax Agreement.  (Doc. No. 1-2.)  The Agreement sets forth the terms and conditions for Inashco's purchase of BPS's RecoverMax system.  (*Id*. at PageID# 23.)  It also expressly incorporates the parties' previous NDA.  (*Id*. at PageID# 38.)

On March 20, 2017, Inashco inspected the RecoverMax system, but BPS did not permit Inashco to inspect the system's "energy-chamber internals."  (Doc. No. 106-6, PageID# 4138.)  The following day, Inashco questioned how the RecoverMax system's "internal principle" is different from the internals of the Palla mill sold by MBE Coal & Minerals Technology GmbH ("MBE").  (Doc. No. 106-7, PageID# 4143.)  Inashco explained to BPS that when it described the RecoverMax system to its colleagues at Inashco's Dutch parent company, they thought it "very obvious that the seemingly very similar heart of both [the RecoverMax system and the Palla mill] machines won't justify the higher" price of the RecoverMax system.  (*Id*. at PageID# 4144.)  Inashco's president, John Joyner, added that Inashco "need[ed] [Conway's] help to sell the advantages [of the RecoverMax system] to the guys in Europe!"  (*Id*. at PageID# 4143.)  Conway responded that BPS was "aware of [the Palla mill] technology."  (*Id*. at PageID# 4142.)  But Conway assured Inashco that the "'devil is in the details' [of the RecoverMax system] and you now know most of the details."  (*Id*.)  Inashco was unconvinced.  (*Id*. at PageID# 4140.)

3

Nonetheless, pursuant to the RecoverMax Agreement, Inashco purchased two RecoverMax systems.  The first was purchased on May 10, 2017, for its facility in Putnam, Connecticut, at a cost of $309,700.  (Doc. No. 92-5, PageID# 2301.)  The second was purchased on January 31, 2018, for its facility in Lancaster, Pennsylvania, at a cost of $753,472.  (Doc. No. 92-4, PageID# 2299.)

In July 2018, BPS began installing the RecoverMax system in Inashco's Putnam facility.  (Doc. No. 104, PageID# 3424.)  The system did not perform as expected.  (Doc. No. 93-2, PageID# 2419.)  BPS recognized the need for "several major design changes to achieve continuous reliable operation" at even "reduced design parameters."  (*Id*.)  If this was not acceptable to Inashco, BPS offered to "remove the system and provide Inashco a complete refund."  (*Id*.)  Additionally, BPS put on hold the installation of its RecoverMax system at Inashco's Lancaster facility.  (*Id*.)

Ultimately, Inashco requested a refund.  On September 25, 2019, the parties executed a Mutual Release and Termination Agreement.  (Doc. No. 1-3.)  In it, the parties agreed to terminate the RecoverMax Agreement, remove the RecoverMax system from Inashco's Putnam facility and refund its cost, and cancel the RecoverMax system purchase order for Inashco's Lancaster facility.  (*Id*. at PageID# 44-46.)  The Mutual Release also provided that the NDA "shall survive termination of the [RecoverMax Agreement], and shall expire on August 3, 2031 unless otherwise terminated earlier in writing by both Parties."  (*Id*. at PageID# 44.)

On January 21, 2019, Inashco executed an agreement with MBE for the purchase of two Palla mills for its Putnam and Lancaster facilities.  (Doc. No. 105-7.)  Inashco also purchased conveyors for use at the two facilities as well as a dust collector for the Lancaster facility.  (Doc. No. 105, PageID# 3647, 3650; *see also* Doc. Nos. 106-20, 106-23.)  Inashco purchased the conveyors and dust collector from ███████████████ respectively.  (*Id*.)  These are the same suppliers BPS used

4

for its RecoverMax system.  (Doc. No. 93-12, PageID# 2822.)  Inashco planned to complete installation of the first Palla mill at its Putnam facility by April 1, 2021.  (Doc. No. 93-5, PageID# 2433.)

### B.    Procedural History

On March 24, 2021, BPS filed a Complaint against Inashco.  (Doc. No. 1.)  Based on Inashco's purchases of the Palla mills, conveyors, and dust collector, BPS alleged that "Inashco is using information and technology gleaned from BPS through the exchange of information under the NDA to accomplish the same results as the RecoverMax system using the Palla Mill system and additional components from the same vendors used by BPS."  (*Id.* at ¶ 54.)  BPS brought three causes of action against Inashco: breach of the NDA (Claim 1); misappropriation of trade secrets (Claim 2); and unjust enrichment (Claim 3).  (*Id.* at ¶¶ 55-75.)  On October 28, 2021, the Court granted Inashco's Motion to Dismiss BPS's third claim for unjust enrichment.  (Doc. No. 13.)

On December 3, 2021, the Court held a Case Management Conference and set case deadlines. (Doc. Nos, 21, 22.)  At the parties' request, the Court extended these deadlines several times.  (Non-Document Orders dated July 26, 2022; October 17, 2022; December 16, 2022; and June 2, 2023.) Ultimately, the deadline for dispositive motions was September 1, 2023.  (Non-Document Order dated June 2, 2023.)

On September 1, 2023, Inashco filed its Motion for Summary Judgment.  (Doc. Nos. 92, 93.) On October 2, 2023, BPS filed its Opposition.  (Doc. Nos. 109, 110.)  And, on October 16, 2023, Inashco filed its Reply.  (Doc. Nos. 113, 114.)

### C.     The Alleged Trade Secrets

On October 28, 2022, during discovery, BPS identified 66 alleged trade secrets that Inashco purportedly misappropriated.  (Doc. No. 93-6, PageID# 2448-55.)  BPS's alleged trade secrets fall into seven broad categories: ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████ (*Id.*)

In its Motion for Summary Judgment, Inashco asserts that BPS "put aside" its 66 alleged trade secrets in favor of an "'umbrella' trade secret,'" summarized as ██████████████████████ ███████████████████████████████████ (Doc. No. 93, PageID# 2409.) To support this assertion, Inashco first cites to the following question that BPS asked Inashco's expert, Jerome Downey: "Are you aware of rod mill technology—prior to being involved in this case, were you aware of ████████████████████████████████████████████████████████████ ████████████████████████████████████ (Doc. No. 93-14, PageID# 3162.)  Inashco then cites to the report of BPS's expert, wherein he opines that BPS's RecoverMax System is a combination of 11 main components.  (Doc. No. 93-9, PageID# 2574.)

In its Opposition, BPS denies that it "abandoned" its 66 individual alleged trade secrets.  (Doc. No. 109, PageID# 4963.)  It also denies that its alleged "umbrella" trade secret is anything new.  (*Id.* at PageID# 4964.)

Inashco devotes its Motion for Summary Judgment to BPS's alleged "umbrella" trade secret and does not directly address BPS's 66 individual trade secrets.  It does so in its Reply as well, that is, after BPS argued it did not abandon its 66 alleged trade secrets.

6

"A plaintiff is required to identify a trade secret with specificity to separate the secret from general knowledge." *Atricure, Inc. v. Meng*, 842 F. App'x 974, 980 (6th Cir. 2021) (citing *Alice's Home v. Childcraft Educ. Corp.*, 2010 Ohio App. LEXIS 3498 at \*9 (Ohio 10th Dist. Ct. App. Sept. 2, 2010)). The Court concludes that BPS has done so here, both as to its 66 individual alleged trade secrets and its "umbrella" trade secret. Accordingly, for purposes of this Memorandum Opinion and Order, the Court will consider both BPS's 66 alleged trade secrets and its "umbrella" trade secret.

## II.    Law and Analysis

### A.    Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of

the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 F. App'x at 508-09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

**B.     Claim 1: Violation of NDA**

In Claim 1, BPS alleges that Inashco "materially breached the NDA by using confidential information obtained from BPS" and "contacting and ordering parts from BPS's suppliers," all to "modify a Palla Mill machine to accomplish the same results as BPS's RecoverMax system." (Doc. No. 1, ¶¶ 59, 60.)

Inashco argues that the Court should grant it summary judgment on BPS's first claim because section 4(d) of the NDA is "clear and unambiguous" and means that "Inashco was free of its use and disclosure obligations with respect to Confidential Information BPS disclosed to Inashco under the NDA." (Doc. No. 93, PageID# 2402.) It further argues that paragraph 4(d) is consistent with other sections of the NDA. (*Id.* at PageID# 2404-05.) Finally, Inashco maintains that there was not a mutual mistake of fact. (*Id.* at PageID# 2406-07.)

8

In response, BPS contends that the NDA is "internally inconsistent" because the NDA is "expressly premised on the parties' sharing proprietary information for the purposes of commencing a business relationship."  (Doc. No. 109, PageID# 4958, 4960.)  BPS also contends that there was a "mutual mistake," and the Court should reform the NDA "and conform it to the parties' true intentions."  (*Id*. at PageID# 4961-62.)

The Court will first consider whether the NDA is ambiguous and then consider whether there was a mutual mistake of fact.

### 1.    Ambiguity

Under Maryland law[1], "the interpretation of a contract is ordinarily a question of law for the court."  *Jos. A. Bank Clothiers, Inc. v. J.A.B.-Columbia, Inc.*, 2017 U.S. Dist. LEXIS 206344 at *17 (D. Md. Dec. 15, 2017) (citing *Grimes v. Gouldmann*, 157 A.3d 331, 334 (Md. Ct. Spec. App. 2017)). "[T]he cardinal rule of contract interpretation is to give effect to the parties' intentions."  *Dumbarton Improvement Ass'n v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 232 (Md. 2013).  To do so, a court "must look to the four corners of the contract and 'ascribe to the contract's language its customary, ordinary, and accepted meaning.'"  *Walmart Real Estate Bus. Tr. v. Quarterfield Partners, LLC*, 2020 U.S. Dist. LEXIS 122580 at *13 (D. Md. July 10, 2020) (quoting *Rockledge Assocs. LLC v. Transamerica Life Ins. Co.*, 2017 U.S. Dist. LEXIS 16039 at *13 (D. Md. Feb. 3, 2017)).  So "even though 'the cardinal rule of contract interpretation is to give effect to the parties' intentions,' the Court does so based solely on the language of the contract, unless the language is ambiguous."  *Id*. (quoting *Rockledge*, 2017 U.S. Dist. LEXIS 16039 at *13).

---

[1]  Section 10.4 of the NDA specifies that the NDA "shall be construed according to the laws of the State of Maryland, without regard to principles of conflict of laws."  (Doc. No. 1-1, PageID# 17.)

"[A] written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning."  *Id.* (quoting *Calomiris v. Woods*, 727 A.2d 358, 363 (Md. 1999)).  A contract is also ambiguous if it is "internally inconsistent such that it can be interpreted at least two ways."  *Joe the Grinder v. Riva, LLC*, 2021 Md. App. LEXIS 628 at *17 (Md. Ct. Spec. App. July 20, 2021) (citing *Conrad/Dommel, LLC v. W. Dev. Co.*, 815 A.2d 828, 843 (Md. Ct. Spec. App. 2003)).  To determine whether a contract is ambiguous, a court "look[s] to 'the entire language of the agreement, not merely a portion thereof.'"  *Id.* (quoting *Weichert Co. of Md. v. Faust*, 19 A.3d 393, 400 (Md. 2011)).

For the following reasons, the Court concludes that the NDA is not ambiguous.

First, section 4(d) of the NDA—when read by a reasonably prudent person—is susceptible to only one meaning.  Section 4(d) reads, in relevant part, that "[t]his Agreement imposes no obligation upon a Recipient with respect to any Confidential Information to the extent that the Confidential Information: . . . (d) is disclosed to the Recipient by, or with the authorization of, the Disclosing Party."  (Doc. No. 1-1, PageID# 15.)  So, by its plain terms, if BPS disclosed, or authorized the disclosure of, confidential information to Inashco, then the NDA "impose[d] no obligation" on Inashco with respect to that information, and vice versa.

Second, section 4(d) is not "facially inconsistent" with other sections of the NDA.  *Joe the Grinder*, 2021 Md. App. LEXIS 628 at *18.  BPS argues that section 4(d) is inconsistent with section 2 because, in that section, the parties "represented to each other that information was to be shared *solely* in the interests of accomplishing the goal of an ongoing business relationship."  (Doc. No. 109, PageID# 4958.)  Section 2 provides that "[t]he Recipient shall use the Confidential Information only for the purposes agreed to between the Parties and for the purpose of determining whether the Parties

10

wish to enter into the Potential Transaction." (Doc. No. 1-1, PageID# 15.) Section 4(d) does not contradict section 2. If BPS did not disclose confidential information to Inashco, but Inashco nonetheless learned of it, then section 2 would limit Inashco's use of that information.

BPS also argues that section 4(d) is inconsistent with section 3 because BPS and Inashco "pledged to each other that . . . they would exert the efforts necessary to maintain the promised confidentiality of the information." (Doc. No. 109, PageID# 4958.) Section 3 reads, in relevant part, that "[t]he Recipient shall maintain the Confidential Information in strict and absolute confidence at all times, and shall not directly or indirectly disclose, expose or make available any part of the Confidential Information to any person or entity." Again, section 4(d) does not contradict this section. Section 3 prohibited Inashco from disclosing confidential information it learned of unless BPS specifically disclosed that information to Inashco under section 4(d).

Finally, BPS contends that section 4(d) is inconsistent with sections 10.7 and 10.9. Section 10.7 provides that "[t]he Recipient shall not circumvent or attempt to circumvent either the specific terms or the general intent of this Agreement." (Doc. No. 1-1, PageID# 17.) As noted above, under Maryland law, a court "must presume that the parties meant what they expressed." *Cochran v. Norkunas*, 919 A.2d 700, 710 (Md. 2007). So, the Court may not "contemplate what [BPS] may have subjectively intended" when it agreed to section 4(d), *id*. at 709, rather it must presume that BPS agreed that section 4(d) was consistent with the NDA's general intent. Section 10.9 only reads that "the effectiveness of this agreement shall automatically expire on the fifteenth anniversary of its effective date." (Doc. No. 1-1, PageID# 17.) This expiration date does not contradict section 4(d)'s exception.

11

BPS cites several cases in support of its argument that the NDA is internally inconsistent. Two are South Carolina state court decisions applying South Carolina law[2], one is a Fourth Circuit case applying South Carolina law[3], and another is a Sixth Circuit decision applying Michigan law[4]. The Court will not consider these cases. *See Herrera v. Churchill McGee*, 680 F.3d 539, 544 (6th Cir. 2012) (federal courts interpret state law by applying the law of the state's highest court and according weight to intermediate state appellate decisions). The three remaining Maryland decisions that BPS cites are distinguishable.

The first case is *Twarowski v. Heart's Desire DCL, LLC*, 2020 U.S. Dist. LEXIS 204138 (D. Md. Oct. 30, 2020). *Twarowski* involved a rental agreement with an indemnification clause that purported to indemnify the defendants against their own negligence. *Id*. at *5. Maryland law requires that such indemnification clauses "expressly or unequivocally state[] that this is the parties' intent." *Id*. at *7 (citing *Steamfitters Local Union No. 602 v. Erie Ins. Exch.*, 233 A.3d 59, 85 (Md. 2020)). The court found that the indemnification clause in the rental agreement before it did not expressly or unequivocally indemnify the defendant against its own negligence because other provisions rendered the clause ambiguous. *Id*. at *7. For example, one provision provided that the tenant would not be responsible for property damage due to acts of the landlord. *Id*. at *8. Another protected the tenant from negligent maintenance by the landlord. *Id*. The NDA in this case has no such indemnification clause, so the requirement in *Twarowski* that the clause be "express or unequivocal" is inapplicable. Rather, the applicable standard, as noted above, is whether the NDA, "when read by a reasonably

---

[2]  *Isle of Palms Pest Control Co. v. Monticello Ins. Co.*, 459 S.E.2d 318 (S.C. Ct. App. 1994) and *S.C. State Budget & Control Bd. v. Prince*, 403 S.E.2d 643 (S.C. 1991).
[3]  *First S. Bank v. Bank of the Ozarks*, 542 F. App'x 280 (4th Cir. 2013).
[4]  *City of Detroit v. TXU Energy Retail Co., L.P.*, 221 F. App'x 387 (6th Cir. 2007).

12

prudent person, . . . is susceptible of more than one meaning." *Calomiris*, 727 A.2d at 363.  As such, *Twarowski* is not helpful to BPS.

The second case is *Allstate Ins. Co. v. Stinebaugh*, 824 A.2d 87 (Md. 2003), which involved an arbitration agreement.  *Id*. at 91.  Under Maryland law, an arbitration clause must be "clear."  *Id*. at 94 (citing *Gold Coast Mall, Inc. v. Larmar Corp.*, 468 A.2d 91, 95 (Md. 1983)).  If it is clear, then "it is initially for the courts to determine whether the subject matter of a dispute falls within the scope of the arbitration clause."  *Id*. (citing *Gold Coast Mall*, 468 A.2d at 95.)  The court found that the arbitration agreement before it was clear.  *Id*. at 95.  It distinguished an earlier case where it had determined an arbitration agreement to be "unclear" because the agreement in that case required the parties to arbitrate all disputes arising out of the contract but also provided rights and remedies other than arbitration.  *Id*.  Yet that internal inconsistency only meant that it was "for the arbitrator to initially decide" whether the dispute fell within the scope of the arbitration clause, not that the arbitration agreement was ambiguous as a matter of law.  *Id*.  *Allstate* dealt with the specific issue of arbitrability, which is not present here.  Therefore, it is not helpful to BPS.

The last case is *Walmart Real Estate Bus. Tr. v. Quarterfield Partners, LLC*, 2020 U.S. Dist. LEXIS 122580 (D. Md. July 10, 2020), which involved an option to purchase clause in a lease agreement.  *Id*. at *2.  The court gave the option clause's language its "customary, ordinary, and accepted [meaning]," and rejected the defendant's interpretation that would have rendered the clause's language "meaningless."  *Id*. at *19, *23.  *Walmart* supports the Court's conclusion that section 4(d) is not ambiguous.  Here, BPS essentially asks that the Court interpret the NDA in a way that ignores section 4(d).  (Doc. No. 109, PageID# 4961.)  If the Court were to accept BPS's interpretation, it would "render meaningless" section 4(d).  *Walmart*, 2020 U.S. Dist. LEXIS 122580

13

at *23.  Instead, the Court is giving section 4(d)'s language its customary, ordinary, and accepted meaning to "avoid interpreting [the NDA] so as to nullify [its] express terms."  *Calomiris*, 727 A.2d at 366.

Accordingly, the Court concludes that section 4(d) is not ambiguous.

### 2.     Mutual Mistake

Under Maryland law, a mutual mistake is "where there has been . . . an agreement actually entered into, but the instrument, in its written form, does not express what was intended by the parties."  *Kishter v. Seven Courts Cmty. Ass'n*, 626 A.2d 993, 994 (Md. Ct. Spec. App. 1993) (quoting *Moyer v. Title Guarantee Co.*, 177 A.2d 714, 714 (Md. 1962)).  A court may consider parol evidence to determine whether there is a mutual mistake.  *Higgins v. Barnes*, 530 A.2d 724, 726 (Md. 1987).  The evidence admitted must be "so clear, strong, and convincing as to leave no reasonable doubt that a mutual mistake was made in the instrument contrary to [the parties'] agreement."  *Kalarestagi v. Catonsville Eye Assocs., LLC*, 2021 Md. App. LEXIS 60 at *23 (Md. Ct. Spec. App. Jan. 29, 2021) (quoting *Hoffman v. Chapman*, 34 A.2d 438 (Md. 1943)).  If the party claiming mutual mistake meets that burden, then the court "will reform [the] written instrument to make it conform to the real intention of the parties."  *Hoffman*, 34 A.2d at 438.

For the following reasons, the Court concludes that there was no mutual mistake.

First is the plain fact that Inashco seeks to enforce the agreement as written.  *See Hewitt v. Dyck-O'Neal, Inc.*, 2021 U.S. Dist. LEXIS 161781 at *6 (D. Md. Aug. 26, 2021) ("Here, there is no evidence of mutual mistake because Defendant clearly seeks to enforce the agreement as written.").

Second, Inashco signed NDAs on at least three other occasions with the exact same language that is in section 4(d) of this NDA.  (Doc. No. 114-1, PageID# 5125; Doc. No. 114-2, PageID# 5131;

14

Doc. No. 114-3, PageID# 5152.)  This suggests Inashco intended to include section 4(d) in the NDA as it appears.

Third, Conway—who signed the NDA on BPS's behalf—testified that he "think[s] there's a typo" in section 4(d).  (Doc. No. 93-12, PageID# 2881.)  When asked where, he responded that the "typo" is in "[t]he meaning."  (*Id.* at PageID# 2882.)  In its Opposition, BPS suggests that "the mistake was likely the substitution of 'Recipient' for 'third party'" so that the section excepts confidential information that "is disclosed to a third party, by or with the authorization of, the Disclosing Party." (Doc. No. 109, PageID# 4962.)  Mutual mistake has a "stringent burden of proof."  *Kishter*, 626 A.2d at 994.  This means that BPS "must show clearly and beyond a reasonable doubt" that the parties intended section 4(d) to read differently than it is written.  *Id.*  Conway's testimony that he "thinks" there was a typo and BPS's suggestion that the mistake was "likely" substituting "Recipient" for "third party" falls far short of evidence that is "so clear, strong, and convincing as to leave no reasonable doubt that a mutual mistake was made."  *Hoffman*, 34 A.2d at 438.  At most, BPS has shown its own mistake in not reading and understanding section 4(d).  This is insufficient.  *See Invictus Aero. Grp., LLC v. Point Blank Enters.*, 2020 U.S. Dist. LEXIS 76322 at *27 (D. Md. Apr. 30, 2020) (finding "no grounds" to reform a contract where a party "only admitted to its own mistake").

Succinctly stated, section 4(d) is not ambiguous, and there was no mutual mistake in its drafting.  It plainly excepts from the NDA any confidential information that BPS disclosed to Inashco. As BPS's first claim is premised on Inashco's alleged breach of the NDA by "using information and technology *gleaned from BPS* through the exchange of information under the NDA" (Doc. No. 1, ¶ 59 (emphasis added)), the Court grants Inashco summary judgment as to Claim 1.

15

### C.      Claim 2: Misappropriation of Trade Secrets

In Claim 2, BPS alleges that "[t]he internal workings of [its] RecoverMax system, the components necessary to install the system in a facility, and the vendors who supply such components are trade secrets."  (Doc. No. 1, ¶ 64.)  "BPS disclosed these trade secrets to Inashco."  (*Id*. at ¶ 65.) And Inashco misappropriated these trades secrets by "create[ing] a system that performs essentially the same function as BPS's RecoverMax system."  (*Id*. at ¶ 66.)

Inashco argues that the Court should grant it summary judgment on this claim because (1) section 4(d) of the NDA means that the information BPS disclosed to Inashco lost its trade secret protection, (2) BPS publicly disclosed its alleged trade secrets (and, as such, they are not actually trade secrets), and (3) there is no evidence of misappropriation.  (Doc. No. 93, PageID# 2407, 2409, 2413.)

BPS counters that (1) section 4(d) does not negate BPS's alleged trade secrets, (2) Inashco did not in fact use BPS's publicly available information to develop its system, and (3) there is "ample" evidence of misappropriation.  (Doc. No. 109, PageID# 4962, 4964-4966, 4968.)

Under Ohio law[5], a trade secrets misappropriation claim requires proof by a preponderance of the evidence of "(1) the existence of a trade secret; (2) acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret."  *Tomaydo-Tomahhdo L.L.C. v. Vozary*, 82 N.E.3d 1180, 1184 (Ohio 8th Dist. Ct. App. 2017) (citing *Heartland Home Fin., Inc. v.*

---

[5]  The parties agree that Ohio law applies to BPS's trade-secrets-misappropriation claim.  (Doc. No. 109, PageID# 4962; Doc. No. 93, PageID# 2407.)  Ohio's trade secrets protection "arose at common law," but in 1994, the General Assembly adopted the Uniform Trade Secrets Act.  *Hanneman Family Funeral Home & Crematorium v. Orians*, 2023 Ohio LEXIS 2028 at *8 (Ohio Oct. 12, 2023).

*Allied Home Mortg. Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008)); *see also Novus Grp., LLC v. Prudential Fin., Inc.*, 74 F.4th 424, 428 (6th Cir. 2023).

For information to be a trade secret, it must meet two conditions. First, it must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." Ohio Rev. Code Ann. § 1333.61(D)(1). And second, it must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Id*. § 1333.61(D)(2).

The Ohio Supreme Court has identified six factors to analyze in determining whether information is a trade secret:

> (1) [t]he extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Hanneman Family Funeral Home & Crematorium v. Orians*, 2023 Ohio LEXIS 2028 at *9 (Ohio Oct. 12, 2023) (citing *Al Minor & Assocs. v. Martin*, 881 N.E.2d 850, 853 (Ohio 2008)).

### 1.    Efforts to Maintain Secrecy

Inashco's first argument attacks the second trade secret condition (and the Ohio Supreme Court's third factor): that the information was subject to reasonable efforts to maintain its secrecy. Inashco contends that because the NDA excepted information that BPS disclosed to Inashco from its confidentiality protections, BPS cannot now claim that the information is a trade secret. (Doc. No. 93, PageID# 2407.)

17

"[A] business or possessor of a potential trade secret must take some active steps to maintain its secrecy." *RECO Equip, Inc. v. Wilson*, 2021 U.S. App. LEXIS 32413 at \*9 (6th Cir. Oct. 28, 2021) (quoting *Handel's Enters. v. Schulenburg*, 765 F. App'x 117, 122 (6th Cir. 2019)). Those steps "need only be 'reasonable' under the circumstances." *Heartland Home*, 258 F. App'x at 862 (citing *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 862 (Ohio 1999)). "[O]ne clear way to waive any trade secret protection" is to fail "to require a third party to enter a confidentiality agreement." *Shepard v. Lokring Tech., LLC*, 2023 U.S. Dist. LEXIS 142926 at \*32-33 (N.D. Ohio Aug. 15, 2023) (Brennan, J.) (quoting *BDT Prods., Inc. v. Lexmark Int'l, Inc.*, 274 F. Supp. 2d 880, 891 (E.D. Ky. 2003)).

Here, BPS and Inashco *did* enter into an NDA—BPS just misunderstood the document it was signing. BPS thought that the NDA meant its "suppliers [were] protected." (Doc. No. 93-12, PageID# 2822.) It also thought that it meant that "[a]ll correspondence between [it] and Inashco [was] considered confidential." (*Id*. at PageID# 2836.) In short, BPS thought that "every time that [it] gave [Inashco] information, it [was] protected" by the NDA. (*Id*.) Indeed, in an email on March 22, 2017, Conway advised Inashco's President and Vice President of Business Development that BPS disclosed its process "under our mutual NDA." (Doc. No. 106-7, PageID# 4142.) A few days later, Conway reiterated "that the information that we shared . . . MUST be handled with the strictest of confidentiality." (Doc. No. 107-10, PageID# 4412.) Even some of Inashco's employees understood the NDA to protect BPS's information. On August 17, 2018, three of Inashco's employees authored an internal memo that warned to "avoid violating (or even the appearance of violating) [Inashco's] NDA with BPS." (Doc. No. 105-10, PageID# 3817.)

All told, there is evidence that BPS took active steps to maintain the secrecy of its information. BPS and Inashco signed an NDA with the written wish "to ensure the security of their confidential information."  (Doc. No. 1-1, PageID# 14.)  Throughout their business relationship, BPS disclosed to Inashco information that it believed to be protected.  BPS reminded Inashco in at least two emails that the information was protected.  And some of Inashco's employees understood the information to be protected.  While BPS misunderstood the NDA and its efforts were ultimately ineffective, the law only requires that BPS's efforts be "reasonable."  *Niemi v. NHK Spring Co.*, 543 F.3d 294, 302 (6th Cir. 2008); *see also Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 725 (7th Cir. 2003), *cited in Niemi*, 543 F.3d at 303 (the law "does not require perfection").  Accordingly, there is a genuine issue of material fact whether BPS took reasonable efforts to maintain the secrecy of its information.  *See Niemi*, 543 F.3d at 301 (the reasonableness of efforts to maintain secrecy "ordinarily represents a question for the jury" and "only in an extreme case can what is a 'reasonable' precaution be determined as a matter of law").

## 2.    Public Disclosure

Inashco next argues that "BPS itself has publicly disclosed each component of its 'umbrella' trade secret in the specifications of its own U.S. patent applications . . . and also its own YouTube videos."  (Doc. No. 93, PageID# 2411.)

BPS responds that (a) "Sixth Circuit case law is clear that . . . Inashco may not avoid a finding of misappropriation based upon a public patent if [it] did not, in fact, obtain information from that patent" (Doc. No. 109, PageID# 4966 (citing *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg.*, 511 F. App'x 398, 409 (6th Cir. 2013)) and (b) the YouTube videos are of BPS's "RecoverMax ASR [(automotive shredder residue)] process," which BPS did not supply to Inashco.  (*Id.*)

In its Reply, Inashco argues that BPS's reliance on *Allied Erecting* is misplaced and conflates two separate issues: whether information is a trade secret and whether the information is ascertainable "from the public record."  (Doc. No. 114, PageID# 5117.)

What *Allied Erecting* stands for is this: generally, "information that has been publicly disclosed," such as "through the filing of patent applications, is no longer eligible for trade secret protection."  511 F. App'x at 409.  But there are two exceptions to this general rule as it applies to patents.  First, "[t]rade secret protection is not lost . . . for processes or specifications related to the device that are not disclosed in the published patent materials."  *Id.* (citing *Rogers Indus. Prods. v. HF Rubber Mach. Inc.*, 936 N.E.2d 122, 126 (Ohio 9th Dist. Ct. App. 2010).  This is self-evident: if processes or specifications—though related to the patented device—are not disclosed in the patent, then they retain their trade secret protection.

Second, if information meets the statutory definition of trade secret, as noted above, then it is not a defense against misappropriation to argue that the plaintiff disclosed that information in its patents if the defendant did not actually rely on those patents.  *Id.* at 410 (citing *Vitro Corp. v. Hall Chem. Co.*, 254 F.2d 787, 793 (6th Cir. 1958))[6].  This exception concerns the second element of a trade-secret-misappropriation claim: acquisition via a confidential relationship.  In other words, a defendant's argument that it could have learned of the plaintiff's trade secrets from publicly available sources "cannot form the basis for summary judgment on the trade secrets claim if, in fact, [the defendant] actually obtained the relevant information via a confidential relationship with [the

---

[6]  The Court notes that *Allied Erecting* is an unpublished case that itself cites *Vitro*, a case from 1958, for this proposition. While both *Allied Erecting* and *Vitro* applied Ohio trade secret law, the Court found no Ohio state decision applying or even mentioning this exception.  As such, the Court questions whether it remains good law.  As noted in the following paragraph, the Court need not resolve this question now.

plaintiff]." *Coda Dev. v. Goodyear Tire & Rubber Co.*, 565 F. Supp. 3d 978, 993 (N.D. Ohio 2021) (Lioi, J.).

Here, Inashco is not arguing that it did not misappropriate BPS's trade secrets because it could have relied on BPS's patents.  Rather, Inashco is arguing that BPS's alleged trade secrets are not trade secrets at all because BPS "outright disclosed" them in its patents.  (Doc. No. 114, PageID# 5117.)  So, the question is whether BPS revealed all its trade secrets in its patent applications.  *See Novak v. Farneman*, 2010 U.S. Dist. LEXIS 123526 at *11 (S.D. Ohio Nov. 9, 2010).  This is generally a question for a jury to decide.  *See Atl. Research Mktg. Sys. v. Troy*, 659 F.3d 1345, 1357 (Fed. Cir. 2011) ("Whether Atlantic Research had a trade secret and whether it was 'something beyond' what was disclosed in [its patent] were matters for the jury to decide.")

In his Declaration, Conway states that the specifics of the RecoverMax bottom ash process BPS built for Inashco are not disclosed in any of BPS's patent applications.  (Doc. No. 104, PageID# 3424-25.)  He provides five examples.  (*Id*. at PageID# 3425.)  First is the ██████████████████████ ████████████████████[7]  (Doc. No. 104-4, PageID# 3468.)  Second are the three dimensional ████████████████████████[8]  (Doc. No. 104-5, PageID# 3470-72.)  Third are the ████ ██████████████████████  (Doc. No. 104-6, PageID# 3474.)  Fourth are the ████ █████████████████████████████████████████  (Doc. No. 104-

---

[7]  BPS identified ████████████████████████████████████████████ as one of its 66 alleged trade secrets.  (Doc. No. 93-6, PageID# 2449.)
[8]  BPS identified ██████████████████████████████████████ as one of its 66 alleged trade secrets.  (*Id*. at PageID# 2452.)

7, PageID# 3476-87.)  Fifth and finally are the ████████████████████████████████████[9]

(Doc. No. 104-8, PageID# 3489-3511.)

As noted above, "processes or specifications related to the patented device that are not disclosed in the patent" can be entitled to trade secret protection. *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg.*, 649 F. Supp. 2d, 713 (N.D. Ohio 2009), *aff'd*, 511 F. App'x 398 (6th Cir. 2013).  Conway's examples are processes and specifications.  Whether BPS disclosed these processes and specifications in its patents thus remains a genuine issue of material fact.  The Court therefore denies Inashco's request for summary judgment on this ground.  *See id.* at 714 ("[I]t would be improper for the Court to resolve these highly technical matters at the summary judgment stage.").

Inashco also argues that BPS disclosed its alleged trade secrets in several YouTube videos. (Doc. No. 93, PageID# 2411.)  BPS disputes this and contends that "the YouTube videos all relate to the RecoverMax ASR process," which is different from what BPS "proposed, engineered, and supplied to Inashco."  (Doc. No. 109, PageID# 4966.)

"[I]t is undisputed as a matter of law that information disclosed by a marketed product cannot be secret." *Sunjoy Indus. Grp., Ltd. v. Permasteel, Inc.*, 2023 U.S. Dist. LEXIS 13257 at *24 (S.D. Ohio Jan. 25, 2023) (citing *ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 643 (6th Cir. 2020)). Conway declared that BPS's YouTube videos market its "RecoverMax Auto Shredder Residue Process," not the incinerator bottom ash process that it sold to Inashco.  (Doc. No. 104, PageID# 3425.)  According to Conway, the ASR process uses different engineering elements.  (*Id.*)  BPS's expert opined that "[b]ecause the feed material [in ASR as compared to incinerator bottom ash] is

---

[9]  BPS identified ████████████████████████████████████ as one of its 66 alleged trade secrets.  (*Id.* at 2452-53.)

significantly different, the equipment required . . . is different." (Doc. No. 93-9, PageID# 2576.) While some equipment is consistent between the two systems, "the application and location of this equipment in the process flow sequencing" and "the operational parameters" are different. (*Id.*) Accordingly, there is a genuine dispute of material fact whether BPS's YouTube videos disclosed its alleged incinerator bottom ash trade secrets.

###    3.    Misappropriation

Inashco's final argument is that there is no evidence of misappropriation. (Doc. No. 93, PageID# 2413.) BPS responds that there is "ample evidence" of misappropriation and provides several examples, addressed below. (Doc. No. 109, PageID# 4967-68.)

Misappropriation means, in part, the "use of another's trade secret without the other's consent, if the . . . user acquired it . . . in breach of a duty of secrecy." *Kendall Holdings, Ltd. v. Eden Cryogenics, LLC*, 521 F. App'x 453, 456 (6th Cir. 2013) (citing Ohio Rev. Code § 1333.61(B)). "[T]he unauthorized use of [the] trade secret" is the third element of a trade-secrets-misappropriation claim. *Tomaydo-Tomahhdo*, 82 N.E.3d at 1184 (citing *Heartland Home*, 258 F. App'x at 861).

For the following reasons, there is sufficient evidence of misappropriation/unauthorized use to create a genuine issue of material fact.

A court "may properly consider circumstantial evidence" of unauthorized use "because corporations rarely keep direct evidence of their [unauthorized] use ready for another party to discover." *Pro. Investigating & Consulting Agency, Inc. v. SOS Sec., LLC*, 2023 U.S. Dist. LEXIS 49175 at *15 (S.D. Ohio Mar. 22, 2023) (quoting *Stratienko v. Cordis Corp.*, 429 F.3d 592, 600 (6th Cir. 2005)). In a case like this one, "[w]here a party alleges misappropriation of a confidential design . . . '[s]ufficient circumstantial evidence of use . . . must demonstrate that (1) the misappropriating

party had access to the secret and (2) the secret and the defendant's design share similar features.'"
*Id.* (quoting *Stratienko*, 429 F.3d at 600).

There is no dispute that Inashco had access.  As to similarity, there is evidence that BPS's system and Inashco's system share similar features.  For example, Conway testified that



(Doc. No. 93-12, PageID# 2873.)  And BPS's expert opined that "both [BPS's system and Inashco's system] utilize the same main equipment to accomplish the desired reduction/recovery material outcome. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (Doc. No. 93-9, PageID# 2576.)  In sum, he opined that the systems "are substantially the same as both use the same main equipment, in the same general processing order to achieve the same desired results."  (*Id.*)

This circumstantial evidence of similarity is sufficient to create a genuine dispute of material fact as to unauthorized use.

## III.  Conclusion

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Inashco's Motion for Summary Judgment.  (Doc. Nos. 92, 93.)  The Court GRANTS summary judgment as to BPS's first claim for breach of contract but DENIES summary judgment as to BPS's second claim for trade secret misappropriation.

24

**IT IS SO ORDERED.**

                                         *s/Pamela A. Barker*

                                         PAMELA A. BARKER

Date: December 8, 2023                    U.S. DISTRICT JUDGE